## John Pratt *et al. versus* Daniel Parkman.

A debtor being about to leave the country, wrote a letter to the plaintiffs, his credit ors, requesting them to settle certain accounts for him as for themselves, including an adventure of coffee shipped by him to Smyrna, and to pass the proceeds to his credit, and should there be any balance due to him, to pay the same to G. & J. B. T. ; and the plaintiffs, on the same day, wrote an answer acceding to the proposition ; the debtor also procured the guaranty of a third person to the plaintiffs, that the coffee should net a certain sum ; effected insurance upon it, payable to the plaintiffs ; indorsed in blank the bill of lading, and delivered it to the plaintiffs, by which bill of lading, however, the coffee was deliverable to a consignee in Smyrna or his assignee ; and wrote to the consignee to remit the proceeds of the coffee to the plaintiffs, and to be governed by their directions in case they should vary the orders already given. The consignee sold the coffee and invested the proceeds in opium, which he sent, together with the invoice and bill of lading, addressed to the debtor ; and upon the arrival of the opium the plaintiffs entered it and paid the duties, and in five days afterward, and while it remained in the custom-house stores, it was attached at the suit of G. & J. B. T. It was *held*, that the property was sold to the plaintiffs, and that they were not guilty of laches in respect to taking possession ; and an action of replevin, brought by them against the attaching officer, was sustained.

REPLEVIN for a box of opium. The writ was dated in December 1832. The defendant pleaded that the property was in Josiah Thompson at the time of the taking, and avowed the taking upon a writ in favor of George and J. B. Thompson against Josiah, and prayed for a return of the opium. The plaintiffs replied, reaffirming the property in themselves ; and upon this issue was joined. The cause was tried before *Wilde* J.

It appeared that the opium was the return proceeds of a shipment of sixty-four bags of coffee, made by Josiah Thompson on the 27th of March, 1832, on board the brig Gold-Hunter, to Smyrna, consigned to James Purdie.

To sustain the issue on their part, the plaintiffs produced two letters, both dated the 10th of April, 1832. One of them, addressed to the plaintiffs by J. Thompson, who had been a clerk in their employment and was then about to leave the country, says, "I leave the following accounts unsettled, which I will thank you to have the goodness to settle for me as for yourself." It then enumerates certain claims and property, including "64 bags coffee per Gold-Hunter to Smyrna, con-

signed to James Purdie." "Mr. James Purdie will write you about the coffee. The same is guarantied by John Purdie to net the cost here, per his guaranty made óver to you. All the proceeds of the above you will please pass to my credit, and should there be any amount due me, I shall give G. & J. B. Thompson an order on you for the same, according to your letter to me of this date. There is also a policy on the coffee, payable to you in case of loss."

The other letter, which is from the plaintiffs to Josiah Thompson, says, " any amount that may arise over the sum you are indebted to us, from the proceeds of the adventures of yours enumerated in your letter of this date, we will pay over to any one you may authorize to receive the same, with the understanding, however, that your note for $ 300 is not to be deducted from said proceeds, but is to remain until you are enabled to remit us the money or otherwise pay it."

At the foot of this letter was an order drawn by J. Thompson on the plaintiffs, to pay G. & J. B. Thompson "any amount there may be due me agreeable to the above."

The plaintiffs read in evidence a paper drawn up and signed by J. Thompson, dated the 29th of March, 1832, showing the cost of the coffee, and that it had been principally paid for by a draft on the plaintiffs, and on which was indorsed the guaranty of John Purdie, payable to the plaintiffs.

The plaintiffs produced the bill of lading of the coffee, dated the 27th of March, 1832, and indorsed by J. Thompson in blank ; the coffee being, by the bill of lading, shipped by J. Thompson and deliverable to James Purdie, at Smyrna, or his assignee. There was no date to the indorsement, but it was admitted that J. Thompson sailed from Boston before the 28th of April, 1832. The plaintiffs also produced a letter from J. Thompson to James Purdie, of Smyrna, dated on the same 27th of March, directing the proceeds of the coffee to be sent and consigned to the plaintiffs, as he did not expect to be in Boston when they would arrive, and directing Purdie, if the plaintiffs should alter the orders given by him, to be governed by their directions.

The opium purchased by the proceeds of the coffee was, as it appeared by the invoice and bill of lading, shipped by James

Purdie to J. Thompson and on his account and risk, and the bill of lading and invoice forwarded by the brig Junius, having also the opium on board, addressed to J. Thompson.

The plaintiffs proved, 'hat upon the arrival of the opium they entered it, viz. on the 17th of December, 1832 ; and it was afterwards, on the 22d of December, attached by Parkman, a deputy sheriff, while it was in the custom-house stores for examination, at the suit of G. & J. B. Thompson.

The plaintiffs then produced their books, showing a balance against J. Thompson on the 10th of April, 1832, of upwards of $ 1100, after deducting the sum of $ 300, as mentioned in the plaintiffs' letter of that date.

If the plaintiffs were entitled to recover, the defendant was to be defaulted.

*March 27th,*
1834.

*Bartlett* insisted that the facts proved a sale of the property to the plaintiffs ; *Adams v. Robinson*, 1 Pick. 462 ; *Peyton v. Hallett*, 1 Caines's R. 379 ; *Gerrish v. Sweetser*, 4 Pick. 374 ; *Conard v. Atlantic Ins. Co.* 1 Peters, 445 ; and that they had used due diligence to take possession, particularly as against G. &. J. B. Thompson ; *Lamb v. Durant*, 12 Mass. R. 54 ; *Lanfear v. Sumner*, 17 Mass. R. 112, 113, 114 ; *Putnam v. Dutch*, 8 Mass. R. 287 ; *Badlam v. Tucker*, 1 Pick. 389 ; *Gardner v. Howland*, 2 Pick. 599 ; *Dennie v. Harris*, 5 Pick. 120 ; [ S. C. 3 Peters, 292.]

*H. H. Fuller, contrà,* contended that the plaintiffs had neither a general property ; Abbott on Shipping, (Story's ed. 1829,) 392, note, 393; *Conard v. Atlantic Ins. Co.* 1 Peters, 445 ; *Stone v. Swift*, 4 Pick. 389 ; *Gallop v. Newman*, 7 Pick. 286 ; *Chapman v. Searle*, 3 Pick. 45, 46 ; *Shaw v. Nudd*, 8 Pick. 9 ; *Bonsey v. Amee*, 8 Pick. 236 ; *Buffington v. Curtis*, 15 Mass. R. 528 ; nor a special property ; *Ladd v. Billings*, 15 Mass. R. 15 ; *Shumway v. Rutter*, 7 Pick. 58 ; 6 East, 21 to 26, note ; *Lickbarrow v. Mason*, 2 T. R. 75 ; nor possession actual or symbolical ; and that consequently they could not maintain the action.

*March 31st,*
1834.

MORTON J. delivered the opinion of the Court. To maintain replevin it is necessary for the plaintiff to show property, general or special, in the thing replevied, and also a right to immediate possession. The only question in this case is,

whether the plaintiffs had such a property as would support the action.

The opium, which is the subject of this suit, was the proceeds of sixty-four bags of coffee shipped to Smyrna by Josian Thompson, March 27th, 1832, and consigned to James Purdie. And we have no doubt that the documents and facts disclosed show a contract of sale. That Thompson *intended* to transfer to the *plaintiffs* his interest in this adventure and other similar property, cannot be questioned. Why did he take John Purdie's guaranty to the *plaintiffs ?* Why make the insurance payable to the *plaintiffs ?* Why direct James Purdie to correspond with the *plaintiffs* in relation to the adventure ? Why order him to consign the return proceeds to the *plaintiffs ?* Why take an obligation from the *plaintiffs* to pay any balance there might be due, to his order ? And why draw an order on them for the balance ? It undoubtedly was, because he intended that the property should pass to the plaintiffs. And the circumstances equally show an intention on the part of the plaintiffs to accept it. It is in vain to say that if the parties had intended a conveyance, they would have made a formal bill of sale. No particular form for the sale of personal property is required. All that is necessary is, that the parties should intend, the one, to part with his property, and the other, to become the owner of it. This union of intention constitutes a contract of sale. And it may be proved by any kind of legal evidence, parol or written ; by a formal conveyance under seal, or by a loose correspondence ; by a conversation direct between the parties, or mediate through the agency of other persons.

Nor is it material to the validity of the sale, whether it be absolute or conditional, unrestricted or clogged with terms and stipulations. If it be *bonâ fide* and for a valuable consideration, it will be a valid contract. Undoubtedly there was in this case a trust and confidence created. Although the contract was that the coffee should become the plaintiffs', it was upon the understanding that the former owner should retain an interest in the adventure ; that although the plaintiffs were to manage the concern as their own, yet they were to account to Thompson for the proceeds, and the profit or loss was to ac-

crue to him. This was a personal obligation assumed by the plaintiffs when they assented to the transfer, but has no tendency to invalidate the conveyance. They had sufficient motives for entering into the contract, without claiming the profits of the adventure. The contract too was complete. Nothing remained to be done by either party, to perfect it.

It only remains to inquire, whether this contract of sale, which we have seen was a legal one, was so executed as to vest the property in the plaintiffs. As between the parties there can be no doubt. In such case a formal delivery is not indispensable. Long on Sales, 148 ; Abbott on Shipping, (Story's ed. 1829,) 12 ; *Gardner* v. *Howland*, 2 Pick. 602 ; *Lanfear* v. *Sumner*, 17 Mass. R. 113.

But as to other parties, there must be not only an agreement to sell, but a delivery of the things sold. One object is, undoubtedly, to give notoriety to the change of ownership. It is like livery of seisin, or the registration of deeds, in relation to real estate. And as the attaching creditors in this case knew of the sale and were not only acquainted with all the circumstances attending it, but to some extent assented and became parties to the arrangement, it may well be doubted whether they could object to the want of a delivery. As to them there was in effect a delivery.

But we have no occasion to decide the case upon this ground ; for we are satisfied here was a legal delivery. When an actual transmission of the thing itself by the seller to the buyer is impossible, various substitutes producing, as far as practicable, the same effect, are allowed. Long on Sales, 162. Thus the delivery of the key of the warehouse in which the goods are stored, or, if a public warehouse, of the receipt for the goods, or an order upon the keeper of the warehouse, or the invoice of the goods, is deemed equivalent to a delivery of the goods themselves. *Wilkes* v. *Ferris*, 5 Johns. R. 335 ; *Harman* v. *Anderson*, 2 Campb. 243 ; *Hollingsworth* v. *Napier*, 3 Caines's R. 182. But it is not necessary to refer to all the various cases in which a symbolical delivery is deemed sufficient. When goods are at sea, as these were, it is manifest that the only delivery which can be made, is that of some

token or evidence of ownership.  And this is always deemed in law equivalent to an actual delivery.

In relation to vessels at sea, a delivery of a bill of sale is deemed sufficient.  Abbott on Shipping, (Story's ed. 1829,) 13 ; *Putnam* v. *Dutch*, 8 Mass. R. 287 ; *Lamb* v. *Durant*, 12 Mass. R. 54 ; *Badlam* v. *Tucker*, 1 Pick. 389.  *Gardner* v. *Howland*, 2 Pick. 599.

The same principle applies to all other chattels in the same situation.  And it may be laid down as a general rule, that when there can be no manual delivery of the whole or any part of the goods sold, a delivery of the muniments of title will be a good symbolical delivery and will pass the property, provided the purchaser uses due diligence to obtain the actual possession.  The property vests in the purchaser, but may be divested by his own laches.

The delivery of a bill of sale, or of a bill of lading, or of an invoice of goods at sea, would be sufficient to pass them.  *Caldwell* v. *Ball*, 1 T. R. 205 ; *Gallop* v. *Newman*, 7 Pick. 283 ; *Gardner* v. *Howland*, 2 Pick. 599 ; *Conard* v. *Atlantic Ins. Co.* 1 Peters, 445.  In several cases, the courts have gone further and holden that where it is not in the power of the vendor to deliver any of these documents, the property will pass without it, provided proper exertions be used to make the earliest practical delivery.  *Wright* v. *Campbell*, 4 Burr. 2051 ; *Lempriere* v. *Pasley*, 2 T. R. 485 ; *Brown* v. *Heathcote*, 1 Atk. 160 ; *Buffington* v. *Curtis*, 15 Mass. R. 528 ; *Gardner* v. *Howland*, 2 Pick. 599.

In the case at bar, there was a delivery of a bill of lading, an invoice, and all the other documents relating to the goods sold, which the owner had.  This, we think, was a good symbolical delivery.  The consignment to Purdie did not vest the property in him.  Although a general consignment may ordinarily transfer the goods to the consignee and the bill of lading be evidence of ownership in him, yet it is only *primâ facie* evidence, open to explanation.  And in this case there is enough to rebut it, and it is not pretended that the consignee acquired a general property in the coffee or the opium.  He was merely the factor of the consignor

A bill of lading, to some extent, partakes of the properties of negotiable securities. It issues to the consignee or his assigns. And like a bill or note may be transferred by indorsement. The consignee in this way may dispose of the property conveyed to him and pass it to his assignee. But where the consignee is named in the bill of lading, the indorsement of the consignor will not transfer the bill or the property for which it was given. Yet it is a very significant act and denotes his intention to part with his interest in it. It certainly adds force to the delivery of the document itself.

The property in the coffee vested in the plaintiffs. They had no power to take possession of it; and therefore were guilty of no laches in omitting to do it. The opium, having been purchased with the coffee, also became theirs. Upon its arrival they promptly entered it and paid the duties. And although it remained a few days in the public stores, there is nothing to show any unusual dilatoriness in getting it through the custom-house. It required no uncommon despatch. If their title to the opium was such that they were bound to use reasonable diligence to get possession, yet we see no evidence of such laches as will defeat it.

*Defendants defaulted.*